Andrew DeWeese, OSB 136332
Andrew DeWeese, PC
3055 SW Yeon Avenue, #527
Portland, Oregon 97210
andrew@andrewdeweese.com
Telephone: (971) 303-0351
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| MARCUS ESTES, | Case No. |
| Plaintiff, | |
| v. | |
| METRC, INC., and METRC ID, LLC, | |
| Defendants. | |

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff MARCUS ESTES hereby files this Complaint seeking injunctive relief and

damages against his former employers, Defendants METRC, INC. and METRC ID, LLC

(collectively, "Defendants").

## **JURISDICTION AND VENUE**

1.      Plaintiff is an individual living in Clatsop County, Oregon.

2.      Defendant METRC, INC. ("Metrc") is a Delaware Corporation with its principal place of business in Lakeland, Florida.

3.      Defendant METRC ID, LLC ("Metrc ID") is a Delaware limited liability company. Upon information and belief, Metrc ID's principal place of business is in Lakeland, Florida.

4.      This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 as Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court has specific personal jurisdiction over Defendants because Defendants employed Plaintiff in Oregon and this action arises out of that employment relationship.

6.      This Court has general personal jurisdiction over Defendants because Defendants do substantial business in Oregon and have substantial contacts with Oregon. In particular, Defendants have a contract with the State of Oregon to provide the cannabis tracking system ("CTS") used by participants in Oregon's state-legal marijuana industry. Additionally, Defendants sell products and services to participants in Oregon's state-legal marijuana industry, including but not limited to unit ID tags, the use of which is mandated under Oregon law.

7.      Venue is appropriate under 28 U.S.C. § 1391(b)(2) because Plaintiff resides in this judicial district and received all communications constituting retaliation for his protected actions, up to and including his termination, in this district. Alternatively, venue is appropriate under 28 U.S.C. § 1391(b)(3) as Defendants do substantial business within this district, supplying software services and physical unit ID tags to (at least) hundreds of customers within this district.

## GENERAL ALLEGATIONS

### A. Metrc's Business.

8.     Metrc is a software-as-a-service ("SaaS") provider which contracts with state regulatory agencies overseeing legalized cannabis programs to provide a cannabis tracking system ("CTS") utilized by the state agency and participants in the programs to track cannabis from growth, harvest, and processing to testing, transport, and sale.

9.     Metrc holds contracts with the state regulatory agencies of Oregon, California, and at least twenty other states, as well as with the District of Columbia and Guam, and is by far the largest provider of CTS solutions to state agencies.

10.     In every state that regulates the production and sale of marijuana, use of a CTS such as the one provided by Metrc is mandated under state law. The purpose of this legal requirement is to prevent cannabis products produced outside of the regulated system from entering the regulated market (inversion), and also to prevent cannabis products produced inside the regulated system from being sold outside of the regulated market (diversion).

11.     The CTS system uses radio-frequency identification ("RFID") tags to track cannabis. These tags are affixed to cannabis products and communicate via radio waves with a handheld reader device, which Metrc claims regulators can use to identify changes, and locate missing or misplaced plants and packages quickly. The RFID tags also have a barcode, which may be scanned with a simple optical scanner.

12.     The utility of the RFID tags is questionable, and reportedly, few regulatory personnel actually use the handheld readers.[1]

---

[1] Halperin, Alex, *SPECIAL REPORT: How Does Metrc Add Value,* WEED WEEK (October 27, 2024), https://www.weedweek.com/stories/special-report-how-does-metrc-add-value/.

13.     However, the utility of the RFID tags to Metrc's business model is abundantly clear. Upon information and belief, the amount of revenue Metrc generates from the sale of its RFID tags is much more than twice the amount it generates from providing software services, with one commentator opining that it must be around four times the amount: "Judging by their revenue, METRC isn't a software company. It's an RFID tag company. They don't offer enforcement, they don't offer data validation, they don't even offer software that holds users accountable. They sell tags, dump the data off to the government to sort through, and pay someone to keep their servers alive."[2]

**B.  Metrc Acquires Chroma Signet and Hires Estes.**

14.     Estes founded Chroma Protocol Corporation ("Chroma") in 2013. Chroma was a company engaged in developing an blockchain-enabled QR platform, called Chroma Signet, that provided protection from counterfeiting and rewarded customers for their loyalty and data by connecting physical objects (for example, a bag of coffee) to digital assets (in the example of a bag of coffee, the digital assets might be all of the details of the coffee's production, any testing, and other supply chain data, including location information).

15.     Estes described Chroma Signet as follows:

Signet was created by Chroma, a protocol design studio founded in 2013. In 2015, we launched the first public security token offering (STO). Chroma Signet is our most ambitious blockchain project to date. Originally developed for the cannabis market for the Select brand, it's now publicly available to any consumer packaged goods company who wants to show the world how their products are made.

Signet is based on Chroma's open protocol for tracking physical objects, and information about them, through space and time. It's a fundamental building block for the supply chain transparency movement and helps empower consumers to vote with their dollars. We specialize in the production of ethical software. Most of our work is designed to

---

[2] The Higher Origins Team, *The Case Against METRC: Why California Should Not Renew Their Contract,* HIGHER ORIGINS (Nov. 9, 2023), https://www.higherorigins.com/articles/the-case-against-metrc-why-california-should-not-renew-their-contract.

improve on market systems by increasing accessibility and transparency. We believe that decentralization will result in a market with more equitable access to capital and the means of production.3

16.     On April 7, 2023, Metrc, through its subsidiary MCS Acquisition, LLC (now named Metrc ID, LLC), acquired the assets of Chroma, including Chroma Signet, via an asset purchase agreement.

17.     As part of the acquisition, Metrc hired Estes as an Executive Vice President at a salary of $175,000 per year, plus participation in an incentive 25% annual cash bonus plan, and a $100,000 signing bonus.

**C.  Estes is Cautioned Against Speaking Ill of RFID Tags.**

18.     Once employed by Metrc, the articulate and outspoken Estes advocated within Metrc that the RFID tags could easily be replaced by paper QR codes vended by Chroma Signet. Estes explained that these QR codes would provide marijuana regulators and licensees far more control and oversight over manufactured products than RFID tags, and would cost next to nothing to produce, since they could be printed on-site by licensees and wouldn't have to be manufactured by Metrc.

19.     In addition to reducing costs and increasing supply chain security, a QR-code based business model had the potential to develop a new revenue model around the generation of a valuable dataset that could replace the revenue lost by transitioning away from the sale of plastic RFID tags, which Estes had learned are widely disliked by the cannabis industry because of their high cost, plastic waste, and perceived inutility.

---

3 Listing for Chroma Signet on The Silicon Forest, retrieved on October 29, 2024, https://www.thesiliconforest.com/company/chroma-signet.

20.     Estes, however, was quickly disabused of the notion that Metrc had any interest in moving away from its lucrative RFID business, and was warned by a co-worker that if Estes continued to speak about the uselessness of the RFID tags that it would hurt his prospects at the company.

**D. Estes Visits Catalyst Cannabis Company and Learns of Metrc's Role in Enabling Diversion.**

21.     As Executive Vice President at Metrc, Estes was at first given a broad charge within the company: advance the interests of Retail ID. No job description was provided for him and he was not often asked to meet with his nominal supervisor, Metrc CTO Sam Peterson. Instead, Estes held a weekly progress meeting with James Daley, Metrc's Head of Product, and supervised the technical team developing Retail ID.

22.     On June 8, 2023, Estes and a colleague took a Metrc-sponsored business trip to a company in California called HNHPC, Inc. dba Catalyst Cannabis Company ("Catalyst") for the purpose of marketing Metrc's products, including Retail ID, to Catalyst, and met with Catalyst's owner, Elliott Lewis.

23.     At the meeting, Lewis, with a sizeable axe to grind, took the opportunity to explain how companies in California divert vast quantities of marijuana from California's legal market to illicit markets in other states[4], and how Metrc was part of the problem.

24.     According to Lewis, criminals use straw purchasers to obtain marijuana distribution licenses under California law. They then purchase bulk quantities of marijuana on

---

[4] Circumstantial evidence of the diversion of state-legal marijuana products from California to other states is easy to come by and reported on often. See, e.g., "Exclusive: Does Stiiizy have a diiiversion problem?" at https://www.weedweek.com/stories/exclusive-does-stiiizy-have-a-diiiversiiion-problem/ and "SCOOP: Glass House products spotted in NYC raid" at https://www.weedweek.com/stories/scoop-glass-house-products-spotted-in-nyc-raid/.

the legal market via the distribution license, and sell the product in the illicit market, most often

in other states. From a CTS perspective, the bulk marijuana is tracked to the distribution license,

and then never leaves. These operations are commonly referred to as "burner distros" (a

reference to "burner" cell phones used by criminals and then thrown away), and because of the

laxity of regulatory enforcement, are generally considered a low-risk, high-reward activity.

25.    Mr. Lewis had done far more than just idly complain. In a complaint filed by

Catalyst in September 2021 against the California Department of Cannabis Control (the "DCC"),

accusing the DCC of turning a blind eye to the burner distro phenomenon to the detriment of

lawful operators, the burner distro scheme is described as follows:

> 4. … Operators (usually legal cannabis operators) purchase or obtain distribution licenses
> in various local jurisdictions, often where cultivation operations are prevalent and/or
> where such licenses are relatively easy and/or cheap to obtain or acquire. Often, an
> operator will procure multiple local licenses by using an array of different "front men"
> who agree to attach their names to the licenses (which is significant, as the State's lack of
> enforcement has made acting as a straw man for a Burner Distro an incredibly high yield,
> low risk endeavor). Once licensed, the Burner Distros then purchase large quantities of
> cannabis from cultivators within the State. In connection with those purchases, the Burner
> Distros (which by law are responsible for collecting and paying all legally mandated
> cultivation and excise taxes) may or may not pay the "cultivation tax" to the State (via
> payment to the California Department of Tax and Fee Administration ("CDTFA")).
>
> 5. Once the cannabis reaches the Burner Distros, however, the DCC effectively ceases
> regulating or even monitoring what happens to that cannabis, and instead relies heavily if
> not exclusively on tips or complaints to instigate investigations or enforcement
> proceedings against illegal operators. As a result, Burner Distros evade payment of the
> 15% excise tax (which in practice amounts to a 27% tax levied on the wholesale price
> based on the State's required "markup" rate) owed by distributors when the cannabis
> products are delivered to retail dispensaries or and/or (to a lesser extent) even when they
> illegally ship the cannabis out of state. As of the date of this Petition, HNHPC is
> informed and believes the amount of excise taxes evaded by Burner Distros total
> hundreds of millions of dollars per year on billions of dollars' worth of cannabis and
> cannabis products, while legitimate distributors are forced to pay the excise tax. The cost
> savings achieved by Burner Distros through the evasion of the excise taxes alone allows
> illegal dispensaries and other unregulated markets to purchase largely if not entirely
> unregulated cannabis from the Burner Distros at a steep discount, which they in turn sell
> at prices far lower than legal dispensaries can sell comparable regulated cannabis
> products obtained from legitimate distributors who in fact pay all such taxes. In essence,

the DCC by its inaction has significantly bolstered the illegal black market in California and encouraged the illegal export of cannabis across state lines.

*HNHPC, Inc. v. Dept. of Cannabis Control, et al.,* Case No. 30-2021-012210114-CU-WM-CJC, Verified Petition for Writ of Mandamus and Complaint for Peremptory Writ of Mandate; and Injunctive Relief, filed September 15, 2021 ("Catalyst's Verified Petition"), at ¶ 4-5 (these proceedings are referred to herein as the "Catalyst v. DCC Action").

26.     The background and disposition of the Catalyst v. DCC Action – and its status at the time of Estes' meeting with Lewis – are important background for this matter and help to put Metrc's subsequent actions and reactions in context.

27.     The gravamen of the Catalyst v. DCC Action is that the DCC "failed to perform its mandatory duties and/or failed to properly perform discretionary duties" because the track and trace system it implemented (that is, the Metrc CTS) did not flag for irregularities, as required by law. *HNHPC, Inc. v. Department of Cannabis Control,* 94 Cal. App. 5th 60, 64 (2023). More specifically, Cal. Bus. & Prof. Code § 26067(b)(2) establishes the requirement that the DCC establish a track and trace program for cannabis and specifies that "[t]he database shall be designed to flag irregularities for the department to investigate."

28.     As a result of these failures, Catalyst alleged, the DCC "bolstered the illegal black market in California and … greatly encouraged the illegal export of cannabis across state lines … by refusing to perform its ministerial duty to flag irregularities within the track and trace system." *Id.*

29.     In its lawsuit, Catalyst "sought mandamus and injunctive relief compelling defendants to comply with their duties and mandating they create and maintain a track and trace system capable of identifying and flagging questionable information for further investigation." *Id.* at 65.

30.     In response to Catalyst's amended petition for a peremptory writ of mandate and injunctive relief, the DCC filed a demurrer in December 2021, stating that the DCC "contracted for the design of an electronic database and specifically identified the need to flag irregularities [and that the Metrc contract] established a methodology for ongoing cooperation [with Metrc] to develop criteria for flagging irregularities." *Id.* In support of the demurrer, the DCC asked the trial court to take judicial notice of its two contracts with Metrc. These contracts specify that the CTS "must automatically flag irregularities based on identified criteria and allow the Licensing Authorities to review the specific cannabis distribution chain activity information that is flagged as irregular." *Id.* As a result, the DCC argued, it had satisfied its mandatory duties and that "any remaining duties were discretionary, including the creation of a track and trace system and the deadline to complete the design of the required electronic database." *Id.*

31.     In essence, the DCC argued that they had a contract with Metrc calling for irregularities to be flagged, and whether that was actually happening was not an issue Catalyst could complain about.

32.     In January 2022, the trial court sustained the demurrer without leave to amend, and in March 2022 the court entered judgment in favor of the DCC. Catalyst timely appealed.

33.     At the time of his meeting with Estes (June 8, 2023), HNHPC/Catalyst/Lewis were waiting for the decision of the appeals court.[5]

34.     The Catalyst v. DCC lawsuit was not the only lawsuit in which Catalyst was embroiled at the time of Lewis's meeting with Estes. In May 2023, Lewis posted an

---

[5] On August 2, 2023, the appeals court issued its decision reversing the trial court's ruling. Upon information and belief, the case is in discovery and is scheduled to go to trial.

inflammatory video to LinkedIn6 alleging that Glass House Brands, one of the largest cannabis producers and retailers in California, was knowingly engaged in illicit market activity (calling it the "largest black market cannabis seller in history") by selling its product to burner distros. Lewis followed up by filing a lawsuit against Glass House on June 6, 2023 (two days before his meeting with Estes), alleging unlawful and unfair business practices and seeking an injunction. Notably, the lawsuit sought discovery of both internal Glass House documents as well as its CTS data.

35.    It is within this context that Lewis met with Estes and railed against Glass House for its alleged criminal and anti-competitive activities, the DCC for its lax enforcement, and Metrc for *enabling the DCC's bad behavior.*

36.    Indeed, given that the plain language of Cal. Bus. & Prof. Code § 26067(b)(2) requires the flagging of irregularities, and that the plain language of the California Metrc contracts also requires Metrc's CTS to flag irregularities, one might ask, why does the actual California CTS *do nothing* to flag irregularities?

37.    Lewis had ready answers to this question. As stated in Catalyst's pleadings: "The State is collecting cultivation taxes from Burner Distros on volumes of cultivated cannabis that DCC knows far exceed the amount that ultimately is sold in licensed dispensaries, so DCC and the State have made the purposeful decision to turn a blind eye to illegal Burner Distros in order to keep that excess cultivation tax money flowing; and (2) for political reasons DCC does not want to admit the system it created for both public protection and revenue collection is an abject

---

[6] https://www.linkedin.com/posts/elliotlewisceo_wftp-activity-7063955963799613440-PzyZ?utm_source=share&utm_medium=member_desktop

failure which neither protects the public nor ensures payment of significant cannabis taxed owed by Burner Distros." Catalyst's Verified Petition, at ¶ 16.

38.    Estes was greatly troubled by Lewis' allegations, which seemed credible. Moreover, because of Estes' familiarity with Metrc's CTS system, Estes also knew that "burner distros" would be easily identifiable via a review of their CTS data, which is available to Metrc in real time. In fact, Estes knew that Metrc could easily verify whether Lewis' burner distro allegations had substance, and that such verification would take no more than a matter of minutes. Estes told Lewis as much, and later verified this realization with other Metrc employees.

39.    Estes realized that Metrc was essentially providing cover for these illegal "burner distro" activities – and for the DCC's failures – by effectively turning a blind eye to the data, even though its contract required it to flag irregularities, and even though it could easily do so.

40.    Indeed, the only conclusion to be drawn from these facts is that Metrc is well aware of the DCC's failures and simply keeps quiet about them in order to maintain their plum position and their contract worth more than $40 million per year, the majority of which is paid indirectly by struggling cannabis licensees, for the wasteful and useless RFID tags.

41.    This seemed to Estes like a gross dereliction of Metrc's agreement with the State of California, a violation of law, and corruption on the part of Metrc. This impression was not improved by Estes' prior experience of Johnson seemingly admitting to hiding the Chroma acquisition from Metrc's regulatory partners.

42.    After reflection, Estes concluded that, far from preventing diversion, Metrc was enabling a vast illegal marketplace, and possibly enabling a corrupt government agency, in

exchange for maintaining its favorable and lucrative position, at the expense of the cannabis
industry in general.

43.     As a result, Estes developed the good faith belief that Metrc was participating in a
conspiracy, along with the DCC and its personnel, to enable the State of California to reap
substantial tax revenue in connection with the illegal interstate[7] sale of marijuana, a violation of
numerous sections of California marijuana law, the Controlled Substances Act, 21 U.S.C. § 801,
et seq., as well as the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§
1961-68, and in derogation of Cal. Bus. & Prof. Code § 26067(b)(2) (establishing the
requirement that the DCC establish a track and trace program for cannabis and specifying that
"[t]he database shall be designed to flag irregularities for the department to investigate.").

### E.  Estes Reports His Concerns to His Supervisor and is Sidelined and Later Terminated.

44.     On June 12, 2023, Estes held his weekly meeting with Daley and summarized his
concerns. Specifically, Estes told Daley in great detail the nature of his conversation with Lewis,
and outlined the accusations methodically. He told Daley that Lewis claimed Glass House was
the largest black market cannabis operator in history, that the DCC turned a blind eye to their
operations, and was able to do so because Metrc's CTS does not automatically flag irregularities.
In other words, Estes reported to Daley information that he in good faith believed was evidence
that Metrc was violating California and federal law, and enabling others to violate California and
federal law, by falsely claiming to the State of California that its software would flag

---

[7] NB: As a matter of fact, the sale of marijuana within California is also illegal. *JCCrandall, LLC
v. Cty. of Santa Barbara,* No. B333201, 2024 Cal. App. LEXIS 684, at *5 (Ct. App. Oct. 29,
2024) ("It is often said that cannabis is legal in California. The statement is not true. Under
federal law cannabis is illegal in every state and territory of the United States.").

irregularities for regulatory review, knowingly failing to do so, and covering for the seemingly corrupt and inept DCC.

45.    To Estes' dismay, Daley was dismissive of Estes' concerns, saying "I wouldn't talk to anyone about this," and that Metrc was only concerned with tracking data, and that flagging irregularities "was not our job."

46.    On June 14, 2023, Estes shared an article[8] from MJBiz Daily, published June 13, 2023, about a lawsuit Catalyst filed against Glass House, on a company Teams chat. Daley responded, "Marcus Estes you called it."

47.    On August 2, 2023, Estes held a recorded sales call with Catalyst's director of operations. During the call, which was recorded by Catalyst, Catalyst's director mentioned Lewis' allegations against Glass House. Having not been given a clear directive to never discuss the matter by Daley or anyone else at Metrc, Estes opined again that the truth of the allegations could easily be confirmed or disproven by a review of Glass House's Metrc data.

48.    Sometime later, during a video meeting with multiple staff members, Johnson stated that he was aware that    "someone's been talking to Catalyst."

**F.  Estes is Reprimanded for Exposing Metrc's Ethically Questionable Business Practices.**

49.    After the acquisition was finalized, Metrc mailed Estes a glass trophy fabricated to honor the transaction.

---

[8] https://mjbizdaily.com/catalyst-cannabis-lawsuit-accuses-glass-house-brands-of-illicit-activity/



50.    Estes took a photo of the trophy and posted it to LinkedIn, where the post quickly gathered dozens of positive reactions and comments.

51.    However, Michael Johnson, CEO of Metrc, quickly texted Estes, directing that he take down the post and photo immediately:

//

//

//

//

//

//

//

//

//

//



52.     Estes was startled and confused that Johnson seemed to be openly admitting to

surreptitiously breaching provisions of contracts Metrc held with state regulatory agencies.

53.     When Estes and Johnson had a follow up conversation later, Estes sought

guidance about how and when to disclose the acquisition. Johnson told Estes that he was aware

that some of Metrc's state contracts forbid Metrc from selling to marijuana licensees. Forming

MCS Acquisition, LLC to acquire Chroma Signet allowed Metrc to conceal the acquisition.

**G. Estes is Grilled by Metrc General Counsel and Frozen Out of his Previous Responsibilities.**

54.    On September 5, 2023, Estes attended a meeting with Metrc's general counsel, Andrea Kiehl. At the meeting, Ms. Kiehl grilled Estes in an apparent effort to discover everything Estes had told Catalyst about Metrc's capabilities with respect to the burner distro situation.

55.    At the conclusion of the meeting, Ms. Kiehl instructed Estes not to talk to anyone about anything related to the "burner distro" allegations. Estes left the meeting with the distinct impression that Metrc was attempting a cover up.

56.    After the meeting with Metrc's general counsel, Metrc began to freeze Estes out of important facets of his previous employment duties and responsibilities.

57.    For example, Metrc excluded Estes from important meetings regarding Retail ID, a product Estes considered his life's work. Metrc did not invite Estes to attend the launch of Retail ID at MJBizCon, an important cannabis industry event in Las Vegas. Any attempt Estes made to gain more involvement in the product was rebuffed, including recommendation of key engineering hires and general management of the software product. Estes was removed from his duty of overseeing the technical team's work on Retail ID. From these and other interactions with Metrc management, Estes formed a definite feeling of being disliked and shunned by Metrc's upper management. This intuition was confirmed repeatedly by one or more of Estes' colleagues in the company. In November 2023, Metrc asked Estes to focus only on sales, and his replacement on the Retail ID project performed poorly and    was terminated after a short time.

58.    Estes was in all respects an exemplary employee. Estes closed nearly every account he was given, and brought in new business from his own network, including Sonoma

Hills Farms, and (in a twist, given his interactions with Lewis) major industry cultivator,

manufacturer, and retailer Glass House Brands. Estes' only clearly defined remaining

responsibility was essentially a sales function (persuading customers to use a free product), and

he performed with a near 100% success rate.

59.     Estes' offer letter agreement states:

This position will be eligible to participate in an incentive bonus plan which will be
earned based on the achievement of goals specific to your individual performance as well
as overall company performance. In your first year of employment, your bonus potential
will be subject to proration for time of service. The goal targets are determined at the
discretion of the CEO and the details of your participation level are as follows: 25% of
your Annual Base Salary.

Offer Letter, dated April 1, 2023. Despite this language, Metrc never informed Estes of any

"goal targets," and indeed never provided Estes with any employment evaluations, feedback, or

even formal discipline. Estes did not receive a pro-rated bonus at the end of 2023.

60.     On March 5, 2024, Metrc initiated Estes' termination without cause, set to occur

on April 18, 2024. The only reason Estes was given for his termination was that his salary was

too high and that management was unhappy with the direction of the Retail ID product line

(which was out of Estes' control, as he had been removed from directing development of the

product months earlier). To Estes' knowledge, his personnel file at Metrc was completely empty,

with no evaluations, records of discipline, or anything else.

61.     On March 7, 2024, Estes notified David Eagleson (Metrc's Director of Program

Management), whom Estes had worked closely with on Retail ID, that he had been terminated.

Eagleson replied, "Hey - first, I'm sorry to hear that and thanks for letting me know. I got a very

vague message from James but don't know anything else myself and do want to sync. I know

you're probably very frustrated and I'm trying to understand more because I just don't get it."

Eagleson later reached out to let Estes know that he would be willing to go to bat for Estes being

a valuable team member and that he was sure he could save Estes' job on the basis of Estes'

performance.

62.     On the same date, Metrc presented Estes with a Separation Agreement and

General Release (the "Proposed Release"), which Metrc urged him to sign in exchange for Metrc

foregoing its claimed right to be repaid the $100,000 signing bonus. Among other things, the

Proposed Release would have released any employment-related claims Estes may have had

against Metrc, and would have subjected him to a two-year noncompetition and nonsolicitation

period. Estes did not respond to Metrc's request that he sign the Proposed Release.

63.     On April 8, 2024, Taylor Coffield (Metrc HR) and Eagleson attended a Teams

conversation with Estes, where Coffield informed Estes that the decision to terminate Estes was

final and non-negotiable. On the call, Estes stated for the first time that his lawyer had advised

that he not sign the Proposed Release.

64.     On April 9, 2024, Metrc terminated Estes' employment, nine days before his

stock options were due to vest.

**DAMAGES**

65.     As a direct and proximate cause of Metrc's actions, Estes has suffered emotional

distress, anguish, humiliation, fear, worry, grief and anxiety, together with a worsening of one or

more pre-existing medical conditions, and requests an award of compensatory damages in an

amount to be determined by a jury at the time of trial, and not to exceed $1,000,0000.

66.     As a direct and proximate cause of Metrc's actions, Estes has also suffered and

continues to suffer loss of earnings, loss of benefits, loss of job opportunities and other

employment benefits which continue to accrue in an amount to be determined at the time of trial

and not to exceed $500,000, together with interest and the amount necessary to offset the income

tax consequences of the award pursuant to ORS 659A.885(1) and/or as special damages under common law.

67.    Estes also seeks equitable relief including reinstatement to Estes' former position and a permanent injunction enjoining Metrc from engaging in any employment practice which discriminates on the basis as alleged in this Complaint.

68.    Estes places Metrc on notice of Estes' intent to move the Court to amend this Complaint to seek punitive damages and to seek discovery of all relevant financial documents from Metrc.

69.    Estes also seeks reasonable attorney's fees and costs in an amount to be proven at trial pursuant to ORS 659A.885(1) and/or ORS 20.107.

## FIRST CLAIM FOR RELIEF

### Whistleblower Retaliation (ORS 659A.199, 659A.885)

70.    Estes realleges paragraphs 1 through 64.

71.    As set forth above, Estes reported to Metrc information Estes in good faith believed to be evidence indicating Metrc was violating federal and/or state laws, rules, or regulations.

72.    In perpetrating the actions described in the above paragraphs, Metrc subjected Estes to retaliation for reporting this information. Specifically, and without limitation, Metrc materially decreased Estes' job responsibilities, failed to allow Estes to participate in the incentive bonus plan in his employment contract, and ultimately terminated Estes. As a result of Metrc's retaliation, Estes suffered injury.

73.    Estes requests an award of damages, equitable relief, costs, and attorney fees as alleged in Paragraphs 65 through 69.

## SECOND CLAIM FOR RELIEF

### Wrongful Discharge

74.     Estes realleges paragraphs 1 through 64.

75.     At all material times, the public policy of the State of Oregon was to prohibit an employer from retaliating against an employee for communicating information indicating that the employer is in knowing violation of a contract with a public entity or has provided a public entity with false or misleading information in connection with the procurement of a state contract, and that retaliation motivated by such a socially undesirable motive is compensable in damages. This public policy is embodied in the common law, statutes, and regulations of the State of Oregon and the United States protecting the public and employees, but no law, statute, or regulation provides an adequate statutory remedy.

76.     As more specifically described above, Estes communicated information, both to Metrc and to the public, indicating that Metrc was in knowing violation of one or more of its state contracts, and also indicating that Metrc had provided false or misleading information to a public entity (the State of Michigan) in connection with the procurement of a state contract.

77.     Metrc's decreasing Estes' job responsibilities and ultimately terminating Estes was in retaliation for Estes' pursuit and exercise of Estes' rights related to Estes' role as an employee, which rights are of important public interest, and such retaliation caused Estes injury.

78.     Estes requests an award of damages, equitable relief, costs, and attorney fees as alleged in Paragraphs 66 through 70.

//

//

//

WHEREFORE, Plaintiff prays for a judgment as follows:

1)      A judgment in favor of Plaintiff declaring he was wrongfully terminated and

        entitled to an award of economic and non-economic damages as proven at trial;

2)      Reinstatement and a permanent injunction enjoining Defendants from engaging in

        any employment practice which discriminates on the basis as alleged in this

        Complaint;

3)      Plaintiff's reasonable attorneys' fees, other fees, costs and expenses of every kind

        incurred in this action;

4)      Prejudgment and post-judgment interest as appropriate and allowed by law;

5)      On all claims, amounts necessary to offset the income tax consequences of

        receiving a lump sum payment, rather than receiving payment of wages over the

        time; and

6)      For such other and further relief as the court deems just and proper.


DATED this April 4, 2025.


                            **ANDREW DEWEESE, PC**


                            By: */s/ Andrew DeWeese*
                            Andrew DeWeese, OSB 136332
                            3055 SW Yeon Avenue, #527
                            Portland, Oregon 97210
                            andrew@andrewdeweese.com
                            Telephone: (971) 303-0351
                            *Attorney for Plaintiff*