Andrew DeWeese, OSB 136332
Andrew DeWeese, PC
3055 SW Yeon Avenue, #527
Portland, Oregon 97210
andrew@andrewdeweese.com
Telephone: (971) 303-0351
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

|  |  |
|---|---|
| MARCUS ESTES,<br><br>Plaintiff,<br><br>v.<br><br>METRC, INC., and METRC ID, LLC,<br><br>Defendants. | Case No. 3:25-cv-00556-IM |

**DECLARATION OF ANDREW C. DEWEESE IN SUPPORT OF PLAINTIFF'S**

**RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

I, ANDREW C. DEWEESE, declare and testify as follows:

1.  I am over 18 years old. I am the owner and lead attorney at Andrew DeWeese, PC. I

    am lead trial attorney for Plaintiff Marcus Estes, in the above captioned case, and

have personal knowledge of the facts set forth herein and make this declaration in support of Plaintiff's Response to Defendants' Motion to Dismiss.

2. The only agreement sought by Estes was detailed in Estes' counsel's August 4, 2024 email: "I'd like to confer with you on 1) agreeing that not filing our counterclaim with our answer is without prejudice to us filing it later if mediation is unsuccessful, adjusting any discovery deadlines to accommodate the late filing, and obtaining the court's approval for that arrangement, and 2) soliciting the court's approval to extend the deadline to engage in mediation to the end of November, or even December, depending on our calendars and mediator availability."

3. Metrc's counsel eventually responded, "With respect to your client's proposed counterclaim, while the allegations in it are inaccurate and will be proven false, if your side brings that counterclaim prior to the mediation, this case will become nearly impossible to settle because Metrc cannot have those false/baseless allegations sitting in the public record without fully disproving them. Thus, if you file the counterclaim before the mediation, we will of course attend the mediation as the Court ordered, but this case will almost certainly not resolve at the mediation under these circumstances. My suggestion is that you file your answer (without the counterclaim and its allegations) and we proceed to the mediation. If the case does not resolve at the mediation, we will stipulate to allow your client to amend his answer to assert his counterclaim and we can proceed from there."

4. Estes' counsel informed Metrc counsel at mediation, in November 2024, that it was likely that Estes' claims would be brought in Oregon, and also so informed the

mediator. A true and correct copy of the first page of Estes' mediation statement is attached hereto as **Exhibit A**.

5.  Indeed, prior to mediation, on Sunday, November 3, 2024, Estes' counsel emailed Metrc counsel updated allegations, labeled "claims," not "counterclaims," stating claims under Oregon law. Estes' counsel even promised to inform Metrc counsel as a courtesy once the case was filed in Oregon, and did so. A true and correct copy of that email is attached hereto as **Exhibit B**.

6.  It is thus puzzling that the first time Estes' counsel learned of Metrc's position there was some kind of enforceable agreement that Estes' claims would only be brought in Florida was on the conferral call prior to the filing of the instant motion, and subsequently in the pages of Metrc's motion.

7.  No such agreement was ever made between the parties or understood between the parties, and is not reasonably derived from any of the emails between the parties.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA AND THE STATE OF OREGON THAT THE FOREGOING IS TRUE AND CORRECT.

DATED: May 23, 2025                  By: */s/ Andrew C. DeWeese*
                                     Andrew C. DeWeese, OSB 136332

**Exhibit A**

<u>**Confidential Mediation Statement – for Mediator Review Only**</u>
Metrc adv. Estes
Mediation set for November 6, 2024

Dear Mr. Griffin,

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████████████

In preparation for this mediation, we provide you with the draft allegations of Estes' putative claims, which he will file in Oregon federal court if mediation is unsuccessful. We follow these allegations with additional factual allegations pertinent to Metrc's second and third claims, and a brief discussion of applicable law.

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

**Exhibit B**

 Outlook

---

## Updated allegations - Metrc adv. Estes

---

**From** Andrew DeWeese <andrew@andrewdeweese.com>

**Date** Sun 11/3/2024 11:30 AM

**To** Ed Carlstedt <ecarlstedt@fordharrison.com>; Nicholas S. Andrews <nandrews@fordharrison.com>

**Cc** Christopher Griffin <chris@chrisgriffinmediation.com>; Steph Barnhart <steph@andrewdeweese.com>

**Bcc** marcus estes <marcus.e@gmail.com>

📎 1 attachment (3 MB)

20241103 Draft Allegations of Estes Putative Claims.pdf;

Ed and Nick,

In preparation for Wednesday's mediation, here are updated allegations Estes will file against Metrc if we are unable to reach settlement.

Thanks,

Andrew DeWeese
Andrew DeWeese, PC
3055 NW Yeon Ave #527
Portland, OR 97210
(971) 303-0351
andrew@andrewdeweese.com

## Draft Allegations of Estes' Putative Claims

### A. Metrc's Business.

1.      Metrc is a software-as-a-service ("SaaS") provider which contracts with state regulatory agencies overseeing legalized cannabis programs to provide a cannabis tracking system ("CTS") utilized by the state agency and participants in the programs to track cannabis from growth, harvest, and processing to testing, transport, and sale.

2.      Metrc holds contracts with the state regulatory agencies of Oregon, California, and at least twenty other states, as well as with the District of Columbia and Guam, and is by far the largest provider of CTS solutions to state agencies.

3.       In every state that regulates the production and sale of marijuana, use of a CTS such as the one provided by Metrc is mandated under state law. The purpose of this legal requirement is to prevent cannabis products produced outside of the regulated system from entering the regulated market (inversion), and also to prevent cannabis products produced inside the regulated system from being sold outside of the regulated market (diversion).

4.      The CTS system uses radio-frequency identification ("RFID") tags to track cannabis. These tags are affixed to cannabis products and communicate via radio waves with a handheld reader device, which Metrc claims regulators can use to identify changes, and locate missing or misplaced plants and packages quickly. The RFID tags also have a barcode, which may be scanned with a simple optical scanner.

5.      The utility of the RFID tags is questionable, and reportedly, few regulatory personnel actually use the handheld readers.[1]

---

[1] Halperin, Alex, *SPECIAL REPORT: How Does Metrc Add Value,* WEED WEEK (October 27, 2024), https://www.weedweek.com/stories/special-report-how-does-metrc-add-value/.

6.      However, the utility of the RFID tags to Metrc's business model is abundantly clear. Upon information and belief, the amount of revenue Metrc generates from the sale of its RFID tags is much more than twice the amount it generates from providing software services, with one commentator opining that it must be around four times the amount: "Judging by their revenue, METRC isn't a software company. It's an RFID tag company. They don't offer enforcement, they don't offer data validation, they don't even offer software that holds users accountable. They sell tags, dump the data off to the government to sort through, and pay someone to keep their servers alive."[2]

7.      Moreover, because Metrc makes so much money from selling the RFID tags, and holds multiple patents preventing any of its competitors from implementing an RFID tag-based CTS, it can afford to under-bid its competitors on state contracts, which is a major reason why it is by far the dominant CTS provider in the United States.

**B. Metrc Acquires Chroma Signet and Hires Estes.**

8.      Estes founded Chroma Protocol Corporation ("Chroma") in 2013. Chroma was a company engaged in developing an blockchain-enabled QR platform, called Chroma Signet, that provided protection from counterfeiting and rewarded customers for their loyalty and data by connecting physical objects (for example, a bag of coffee) to digital assets (in the example of a bag of coffee, the digital assets might be all of the details of the coffee's production, any testing, and other supply chain data, including location information).

9.      Estes described Chroma Signet as follows:

Signet was created by Chroma, a protocol design studio founded in 2013. In 2015, we launched the first public security token offering (STO). Chroma Signet is our most

---

[2] The Higher Origins Team, *The Case Against METRC: Why California Should Not Renew Their Contract,* HIGHER ORIGINS (Nov. 9, 2023), https://www.higherorigins.com/articles/the-case-against-metrc-why-california-should-not-renew-their-contract.

ambitious blockchain project to date. Originally developed for the cannabis market for the Select brand, it's now publicly available to any consumer packaged goods company who wants to show the world how their products are made.

Signet is based on Chroma's open protocol for tracking physical objects, and information about them, through space and time. It's a fundamental building block for the supply chain transparency movement and helps empower consumers to vote with their dollars. We specialize in the production of ethical software. Most of our work is designed to improve on market systems by increasing accessibility and transparency. We believe that decentralization will result in a market with more equitable access to capital and the means of production.[3]

10.     On April 7, 2023, Metrc, through its subsidiary MCS Acquisition, LLC (now named Metrc ID, LLC), acquired the assets of Chroma, including Chroma Signet, via an asset purchase agreement.

11.     As part of the acquisition, Metrc hired Estes as an Executive Vice President at a salary of $175,000 per year, plus participation in an incentive 25% annual cash bonus plan, and a $100,000 signing bonus.

**C.  Estes is First Exposed to Metrc's Ethically Questionable Business Practices.**

12.     After the acquisition was finalized, Metrc mailed Estes a glass trophy fabricated to honor the transaction.

---

[3] Listing for Chroma Signet on The Silicon Forest, retrieved on October 29, 2024, https://www.thesiliconforest.com/company/chroma-signet.



13.     Estes took a photo of the trophy and posted it to LinkedIn, where the post quickly

gathered dozens of positive reactions and comments.

14.     However, Michael Johnson, CEO of Metrc, quickly texted Estes, directing that he

take down the post and photo immediately:

15.    Estes was startled and confused that Johnson seemed to be openly admitting to surreptitiously breaching provisions of contracts Metrc held with state regulatory agencies.

16.    When Estes and Johnson had a follow up conversation later, Estes sought guidance about how and when to disclose the acquisition. Johnson told Estes that he was aware that some of Metrc's state contracts forbid Metrc from selling to marijuana licensees. Forming MCS Acquisition, LLC to acquire Chroma Signet allowed Metrc to conceal the acquisition.

17.    When Estes asked Johnson how and when he could disclose the acquisition, Johnson initially suggested that they could preserve the Chroma Signet brand in the marketplace and Estes could pretend that it was still a startup and that Estes was still CEO, while secretly being fully employed by Metrc. Estes was unwilling to lie about the acquisition, so rebuffed Johnson's suggestion. After this interaction, Johnson did not address the issue with Estes again, and rarely, if ever, addressed Estes directly.

**D.  Estes is Cautioned Against Speaking Ill of RFID Tags.**

18.    Once employed by Metrc, the articulate and outspoken Estes advocated within Metrc that the RFID tags could easily be replaced by paper QR codes vended by Chroma Signet. Estes explained that these QR codes would provide marijuana regulators and licensees far more control and oversight over manufactured products than RFID tags, and would cost next to nothing to produce, since they could be printed on-site by licensees and wouldn't have to be manufactured by Metrc.

19.    In addition to reducing costs and increasing supply chain security, a QR-code based business model had the potential to develop a new revenue model around the generation of a valuable dataset that could replace the revenue lost by transitioning away from the sale of plastic RFID tags, which Estes had learned are widely disliked by the cannabis industry because of their high cost, plastic waste, and perceived inutility.

20.    Estes, however, was quickly disabused of the notion that Metrc had any interest in moving away from its lucrative RFID business. On or around May 23, 2023, Estes met over drinks at a hotel bar with Jesse Naranjo, Metrc's current VP of Engineering, Ex-CTO, and a software developer who was the primary architect of the Metrc system since its inception.

21.     Naranjo sternly warned Estes that if Estes continued to speak about the uselessness of the RFID tags that it would hurt his prospects at the company. He said that most senior staff at Metrc already knew that the tags were useless and could easily be replaced by database entries that required no physical tag. Naranjo said he spoke from experience, and that when he previously protested the existence of the tags he was disciplined by Metrc's then-CEO, and ultimately demoted.

**E. Estes Visits Catalyst Cannabis Company and Learns of Metrc's Role in Enabling Diversion.**

22.     As Executive Vice President at Metrc, Estes was at first given a broad charge within the company: advance the interests of Retail ID. No job description was provided for him and he was not often asked to meet with his nominal supervisor, Metrc CTO Sam Peterson. Instead, Estes held a weekly progress meeting with James Daley, Metrc's Head of Product, and supervised the technical team developing Retail ID.

23.     On June 8, 2023, Estes and a colleague took a Metrc-sponsored business trip to a company in California called HNHPC, Inc. dba Catalyst Cannabis Company ("Catalyst") for the purpose of marketing Metrc's products, including Retail ID, to Catalyst, and met with Catalyst's owner, Elliott Lewis.

24.     At the meeting, Lewis, with a sizeable axe to grind, took the opportunity to explain how companies in California divert vast quantities of marijuana from California's legal market to illicit markets in other states[4], and how Metrc was part of the problem.

---

[4] Circumstantial evidence of the diversion of state-legal marijuana products from California to other states is easy to come by and reported on often. See, e.g., "Exclusive: Does Stiiizy have a diiiversion problem?" at https://www.weedweek.com/stories/exclusive-does-stiiizy-have-a-diiiversiiion-problem/ and "SCOOP: Glass House products spotted in NYC raid" at https://www.weedweek.com/stories/scoop-glass-house-products-spotted-in-nyc-raid/.

25.     According to Lewis, criminals use straw purchasers to obtain marijuana distribution licenses under California law. They then purchase bulk quantities of marijuana on the legal market via the distribution license, and sell the product in the illicit market, most often in other states. From a CTS perspective, the bulk marijuana is tracked to the distribution license, and then never leaves. These operations are commonly referred to as "burner distros" (a reference to "burner" cell phones used by criminals and then thrown away), and because of the laxity of regulatory enforcement, are generally considered a low-risk, high-reward activity.

26.     Mr. Lewis had done far more than just idly complain. In a complaint filed by Catalyst in September 2021 against the California Department of Cannabis Control (the "DCC"), accusing the DCC of turning a blind eye to the burner distro phenomenon to the detriment of lawful operators, the burner distro scheme is described as follows:

> 4. … Operators (usually legal cannabis operators) purchase or obtain distribution licenses in various local jurisdictions, often where cultivation operations are prevalent and/or where such licenses are relatively easy and/or cheap to obtain or acquire. Often, an operator will procure multiple local licenses by using an array of different "front men" who agree to attach their names to the licenses (which is significant, as the State's lack of enforcement has made acting as a straw man for a Burner Distro an incredibly high yield, low risk endeavor). Once licensed, the Burner Distros then purchase large quantities of cannabis from cultivators within the State. In connection with those purchases, the Burner Distros (which by law are responsible for collecting and paying all legally mandated cultivation and excise taxes) may or may not pay the "cultivation tax" to the State (via payment to the California Department of Tax and Fee Administration ("CDTFA")).
>
> 5. Once the cannabis reaches the Burner Distros, however, the DCC effectively ceases regulating or even monitoring what happens to that cannabis, and instead relies heavily if not exclusively on tips or complaints to instigate investigations or enforcement proceedings against illegal operators. As a result, Burner Distros evade payment of the 15% excise tax (which in practice amounts to a 27% tax levied on the wholesale price based on the State's required "markup" rate) owed by distributors when the cannabis products are delivered to retail dispensaries or and/or (to a lesser extent) even when they illegally ship the cannabis out of state. As of the date of this Petition, HNHPC is informed and believes the amount of excise taxes evaded by Burner Distros total hundreds of millions of dollars per year on billions of dollars' worth of cannabis and cannabis products, while legitimate distributors are forced to pay the excise tax. The cost savings achieved by Burner Distros through the evasion of the excise taxes alone allows

illegal dispensaries and other unregulated markets to purchase largely if not entirely unregulated cannabis from the Burner Distros at a steep discount, which they in turn sell at prices far lower than legal dispensaries can sell comparable regulated cannabis products obtained from legitimate distributors who in fact pay all such taxes. In essence, the DCC by its inaction has significantly bolstered the illegal black market in California and encouraged the illegal export of cannabis across state lines.

*HNHPC, Inc. v. Dept. of Cannabis Control, et al.,* Case No. 30-2021-012210114-CU-WM-CJC,

Verified Petition for Writ of Mandamus and Complaint for Peremptory Writ of Mandate; and

Injunctive Relief, filed September 15, 2021 ("Catalyst's Verified Petition"), at ¶ 4-5 (these

proceedings are referred to herein as the "Catalyst v. DCC Action").

27.    The background and disposition of the Catalyst v. DCC Action – and its status at

the time of Estes' meeting with Lewis – are important background for this matter and help to put

Metrc's subsequent actions and reactions in context.

28.    The gravamen of the Catalyst v. DCC Action is that the DCC "failed to perform

its mandatory duties and/or failed to properly perform discretionary duties" because the track and

trace system it implemented (that is, the Metrc CTS) did not flag for irregularities, as required by

law. *HNHPC, Inc. v. Department of Cannabis Control,* 94 Cal. App. 5th 60, 64 (2023). More

specifically, Cal. Bus. & Prof. Code § 26067(b)(2) establishes the requirement that the DCC

establish a track and trace program for cannabis and specifies that "[t]he database shall be

designed to flag irregularities for the department to investigate."

29.    As a result of these failures, Catalyst alleged, the DCC "bolstered the illegal black

market in California and … greatly encouraged the illegal export of cannabis across state lines

… by refusing to perform its ministerial duty to flag irregularities within the track and trace

system." *Id.*

30.    In its lawsuit, Catalyst "sought mandamus and injunctive relief compelling

defendants to comply with their duties and mandating they create and maintain a track and trace

system capable of identifying and flagging questionable information for further investigation." *Id.* at 65.

31.    In response to Catalyst's amended petition for a peremptory writ of mandate and injunctive relief, the DCC filed a demurrer in December 2021, stating that the DCC "contracted for the design of an electronic database and specifically identified the need to flag irregularities [and that the Metrc contract] established a methodology for ongoing cooperation [with Metrc] to develop criteria for flagging irregularities." *Id.* In support of the demurrer, the DCC asked the trial court to take judicial notice of its two contracts with Metrc. These contracts specify that the CTS "must automatically flag irregularities based on identified criteria and allow the Licensing Authorities to review the specific cannabis distribution chain activity information that is flagged as irregular." *Id.* As a result, the DCC argued, it had satisfied its mandatory duties and that "any remaining duties were discretionary, including the creation of a track and trace system and the deadline to complete the design of the required electronic database." *Id.*

32.    In essence, the DCC argued that they had a contract with Metrc calling for irregularities to be flagged, and whether that was actually happening was not an issue Catalyst could complain about.

33.    In January 2022, the trial court sustained the demurrer without leave to amend, and in March 2022 the court entered judgment in favor of the DCC. Catalyst timely appealed.

34.    At the time of his meeting with Estes (June 8, 2023), HNHPC/Catalyst/Lewis were waiting for the decision of the appeals court.[5]

---

[5] On August 2, 2023, the appeals court issued its decision reversing the trial court's ruling. Upon information and belief, the case is in discovery and is scheduled to go to trial on April 1, 2025.

35. The Catalyst v. DCC lawsuit was not the only lawsuit in which Catalyst was embroiled at the time of Lewis's meeting with Estes. In May 2023, Lewis posted an inflammatory video to LinkedIn[6] alleging that Glass House Brands, one of the largest cannabis producers and retailers in California, was knowingly engaged in illicit market activity (calling it the "largest black market cannabis seller in history") by selling its product to burner distros. Lewis followed up by filing a lawsuit against Glass House on June 6, 2023 (two days before his meeting with Estes), alleging unlawful and unfair business practices and seeking an injunction. Notably, the lawsuit sought discovery of both internal Glass House documents as well as its CTS data.

36. It is within this context that Lewis met with Estes and railed against Glass House for its alleged criminal and anti-competitive activities, the DCC for its lax enforcement, and Metrc for *enabling the DCC's bad behavior.*

37. Indeed, given that the plain language of Cal. Bus. & Prof. Code § 26067(b)(2) requires the flagging of irregularities, and that the plain language of the California Metrc contracts also requires Metrc's CTS to flag irregularities, one might ask, why does the actual California CTS *do nothing* to flag irregularities?

38. Lewis had ready answers to this question. As stated in Catalyst's pleadings: "The State is collecting cultivation taxes from Burner Distros on volumes of cultivated cannabis that DCC knows far exceed the amount that ultimately is sold in licensed dispensaries, so DCC and the State have made the purposeful decision to turn a blind eye to illegal Burner Distros in order to keep that excess cultivation tax money flowing; and (2) for political reasons DCC does not

---

[6] https://www.linkedin.com/posts/elliotlewisceo_wftp-activity-7063955963799613440-PzyZ?utm_source=share&utm_medium=member_desktop

want to admit the system it created for both public protection and revenue collection is an abject failure which neither protects the public nor ensures payment of significant cannabis taxed owed by Burner Distros." Catalyst's Verified Petition, at ¶ 16.

39.    Estes was greatly troubled by Lewis' allegations, which seemed credible. Moreover, because of Estes' familiarity with Metrc's CTS system, Estes also knew that "burner distros" would be easily identifiable via a review of their CTS data, which is available to Metrc in real time. In fact, Estes knew that Metrc could easily verify whether Lewis' allegations had substance, and that such verification would take no more than a matter of minutes. Estes told Lewis as much, and later verified this realization with other Metrc employees.

40.    Estes realized that Metrc was essentially providing cover for these illegal "burner distro" activities – and for the DCC's failures – by effectively turning a blind eye to the data, even though its contract required it to flag irregularities, and even though it could easily do so.

41.    Indeed, the only conclusion to be drawn from these facts is that Metrc is well aware of the DCC's failures and simply keeps quiet about them in order to maintain their plum position and their contract worth more than $40 million per year, the majority of which is paid indirectly by struggling cannabis licensees, for the wasteful and useless RFID tags.

42.    This seemed to Estes like a gross dereliction of Metrc's agreement with the State of California, a violation of law, and corruption on the part of Metrc. This impression was not improved by Estes' prior experiences of Johnson seemingly admitting to hiding the Chroma acquisition from Metrc's regulatory partners, and Naranjo admitting that Metrc senior management knows that RFID tags do nothing to securely track cannabis products that could not be achieved with a database entry.

43.     After reflection, Estes concluded that, far from preventing diversion, Metrc was enabling a vast illegal marketplace, and possibly enabling a corrupt government agency, in exchange for maintaining its favorable and lucrative position, at the expense of the cannabis industry in general.

44.     As a result, Estes developed the good faith belief that Metrc was participating in a conspiracy, along with the DCC and its personnel, to enable the State of California to reap substantial tax revenue in connection with the illegal interstate[7] sale of marijuana, a violation of numerous sections of California marijuana law, the Controlled Substances Act, 21 U.S.C. § 801, et seq., as well as the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68, and in derogation of Cal. Bus. & Prof. Code § 26067(b)(2) (establishing the requirement that the DCC establish a track and trace program for cannabis and specifying that "[t]he database shall be designed to flag irregularities for the department to investigate.").

### F.  Estes Reports His Concerns to His Supervisor and is Sidelined and Later Terminated.

45.     On June 12, 2023, Estes held his weekly meeting with Daley and summarized his concerns. Specifically, Estes told Daley in great detail the nature of his conversation with Lewis, and outlined the accusations methodically. He told Daley that Lewis claimed Glass House was the largest black market cannabis operator in history, that the DCC turned a blind eye to their operations, and was able to do so because Metrc's CTS does not automatically flag irregularities. In other words, Estes reported to Daley information that he in good faith believed was evidence

---

[7] NB: As a matter of fact, the sale of marijuana within California is also illegal. *JCCrandall, LLC v. Cty. of Santa Barbara,* No. B333201, 2024 Cal. App. LEXIS 684, at *5 (Ct. App. Oct. 29, 2024) ("It is often said that cannabis is legal in California. The statement is not true. Under federal law cannabis is illegal in every state and territory of the United States.").

that Metrc was violating California and federal law, and enabling others to violate California and federal law, by falsely claiming to the State of California that its software would flag irregularities for regulatory review, knowingly failing to do so, and covering for the seemingly corrupt and inept DCC.

46.    To Estes' dismay, Daley was dismissive of Estes' concerns, saying "I wouldn't talk to anyone about this," and that Metrc was only concerned with tracking data, and that flagging irregularities "was not our job."

47.    On June 14, 2023, Estes shared an article[8] from MJBiz Daily, published June 13, 2023, about a lawsuit Catalyst filed against Glass House, on a company Teams chat. Daley responded, "Marcus Estes you called it."

48.    On August 2, 2023, Estes held a recorded sales call with Catalyst's director of operations. During the call, which was recorded by Catalyst, Catalyst's director mentioned Lewis' allegations against Glass House. Having not been given a clear directive to never discuss the matter by Daley or anyone else at Metrc, Estes opined again that the truth of the allegations could easily be confirmed or disproven by a review of Glass House's Metrc data.

49.    Sometime later, during a video meeting with multiple staff members, Johnson stated that he was aware that "apparently someone's been talking to Catalyst."

50.    On September 5, 2023, Estes attended a meeting with Metrc's general counsel, Andrea Kiehl, to discuss Catalyst's allegations. At the meeting, Ms. Kiehl grilled Estes in an apparent effort to discover everything Estes had told Catalyst about Metrc's capabilities with respect to the burner distro situation.

---

[8] https://mjbizdaily.com/catalyst-cannabis-lawsuit-accuses-glass-house-brands-of-illicit-activity/

51.    At the conclusion of the meeting, Ms. Kiehl instructed Estes not to talk to anyone about anything related to the "burner distro" allegations. Estes left the meeting with the distinct impression that Metrc was attempting a cover up.

52.    After the meeting with Metrc's general counsel, Metrc began to freeze Estes out of important facets of his previous employment duties and responsibilities.

53.    For example, Metrc excluded Estes from important meetings regarding Retail ID, a product Estes considered his life's work. Metrc did not invite Estes to attend the launch of Retail ID at MJBizCon, an important cannabis industry event in Las Vegas. Any attempt Estes made to gain more involvement in the product was rebuffed, including recommendation of key engineering hires and general management of the software product. Estes was removed from his duty of overseeing the technical team's work on Retail ID. From these and other interactions with Metrc management, Estes formed a definite feeling of being disliked and shunned by Metrc's upper management. This intuition was confirmed repeatedly by one or more of Estes' colleagues in the company. In November 2023, Metrc asked Estes to focus only on sales, and his replacement on the Retail ID project was unqualified and was terminated after a short time.

54.    Estes was in all respects an exemplary employee. Estes closed nearly every account he was given, and brought in new business from his own network, including Sonoma Hills Farms, and (in a twist, given his interactions with Lewis) major industry cultivator, manufacturer, and retailer Glass House Brands. Estes' only clearly defined remaining responsibility was essentially a sales function (persuading customers to use a free product), and he performed with a near 100% success rate.

55.    Estes' offer letter agreement states:

This position will be eligible to participate in an incentive bonus plan which will be earned based on the achievement of goals specific to your individual performance as well

as overall company performance. In your first year of employment, your bonus potential will be subject to proration for time of service. The goal targets are determined at the discretion of the CEO and the details of your participation level are as follows: 25% of your Annual Base Salary.

Offer Letter, dated April 1, 2023. Despite this language, Metrc never informed Estes of any "goal targets," and indeed never provided Estes with any employment evaluations, feedback, or even formal discipline. Estes did not receive a pro-rated bonus at the end of 2023.

56.     On March 5, 2024, Metrc initiated Estes' termination without cause, set to occur on April 18, 2024. The only reason Estes was given for his termination was that his salary was too high and that management was unhappy with the direction of the Retail ID product line (which was out of Estes' control, as he had been removed from directing development of the product months earlier). To Estes' knowledge, his personnel file at Metrc was completely empty, with no evaluations, records of discipline, or anything else.

57.     On March 7, 2024, Estes notified David Eagleson (Metrc's Director of Program Management), whom Estes had worked closely with on Retail ID, that he had been terminated. Eagleson replied, "Hey - first, I'm sorry to hear that and thanks for letting me know. I got a very vague message from James but don't know anything else myself and do want to sync. I know you're probably very frustrated and I'm trying to understand more because I just don't get it." Eagleson later reached out to let Estes know that he would be willing to go to bat for Estes being a valuable team member and that he was sure he could save Estes' job on the basis of Estes' performance.

58.     On the same date, Metrc presented Estes with a Separation Agreement and General Release (the "Proposed Release"), which Metrc urged him to sign in exchange for Metrc foregoing its claimed right to be repaid the $100,000 signing bonus. Among other things, the Proposed Release would have released any employment-related claims Estes may have had

against Metrc, and would have subjected him to a two-year noncompetition and nonsolicitation period. Estes did not respond to Metrc's request that he sign the Proposed Release.

59.    On April 8, 2024, Taylor Coffield (Metrc HR) and Eagleson attended a Teams conversation with Estes, where Coffield informed Estes that the decision to terminate Estes was final and non-negotiable. On the call, Estes stated for the first time that his lawyer had advised that he not sign the Proposed Release.

60.    On April 9, 2024, Metrc terminated Estes' employment, nine days before his stock options were due to vest.

61.    In or around the week of April 18, 2024, another staff member of the Retail ID team traveled to Metrc headquarters in Florida, and was granted a meeting with Metrc CEO Michael Johnson, which was held in Johnson's office.

62.    During the meeting, the staff member asked for Johnson's explanation for having terminated Estes against the advice of core members of the Retail ID team.

63.    Johnson stated to the staff member that after Eagleson's recommendation that Estes' termination be reversed, Johnson initially agreed with him, but after Estes declined to sign the Proposed Release, Johnson decided Estes had to be terminated. These statements were false, as Estes had not refused to sign the Proposed Release until the Teams call on April 8, 2024.

### G.  Post-Termination Threats.

64.    On June 11, 2024, Estes obtained a position as Chief Technical Officer of Genetica, a cannabis tech company that specializes in cannabis retail data analysis.

65.    Genetica's most important data partner is Dutchie, a dominant point of sale ("POS") company in the cannabis industry. Genetica and Dutchie are currently in the developing stages of a deeper partnership.

66.    On September 6, 2024, Dutchie's Chief Technical Officer, Chris Ostrowski, traveled to Genetica's Headquarters to meet with Estes and the senior leadership at Genetica to discuss a business deal. They met for seven hours and Ostrowski said, after having received a software demo of Estes' new product, "This is the best demo in the cannabis industry."

67.    On October 21st, 2024, Genetica's Chief Revenue Office, Christian Blake, notified Estes of a troubling development. Ostrowski was reported to have phoned Blake in order to discuss Metrc's litigation against Estes. Blake told Estes that Ostrowski has a good relationship with Michael Johnson, CEO of Metrc. Ostrowski reportedly expressed concern about whether Estes would go public with his claims against Metrc. Blake insinuated that Estes' job at Genetica would be jeopardized if he failed to settle with Metrc in mediation.

68.    It is unknown how Ostrowski became aware of Metrc's claims against Estes, or Estes' putative claims against Metrc, which have only been shared with Metrc via its attorney in a confidential settlement communication. Metrc is one of Dutchie's most critical software partners; in states where Metrc is deployed, every single cannabis transaction recorded via Dutchie's POS system must be registered with Metrc. Failure to do so reliably could have extremely adverse effects on the state of Dutchie's business.

## DAMAGES

69.    As a direct and proximate cause of Metrc's actions, Estes has suffered emotional distress, anguish, humiliation, fear, worry, grief and anxiety, together with a worsening of one or

more pre-existing medical conditions, and requests an award of compensatory damages in an amount to be determined by a jury at the time of trial, and not to exceed $XXXXXX.

70.     As a direct and proximate cause of Metrc's actions, Estes has also suffered and continues to suffer loss of earnings, loss of benefits, loss of job opportunities and other employment benefits which continue to accrue in an amount to be determined at the time of trial and no less than $XXXXXX, together with interest and the amount necessary to offset the income tax consequences of the award pursuant to ORS 659A.885(1) and/or as special damages under common law.

71.     Estes also seeks equitable relief including reinstatement to Estes' former position and a permanent injunction enjoining Metrc from engaging in any employment practice which discriminates on the basis as alleged in this Complaint.

72.     Estes places Metrc on notice of Estes' intent to move the Court to amend this Complaint to seek punitive damages and to seek discovery of all relevant financial documents from Metrc.

73.     Estes also seeks reasonable attorney's fees and costs in an amount to be proven at trial pursuant to ORS 659A.885(1) and/or ORS 20.107.

## FIRST CLAIM FOR RELIEF

### Whistleblower Retaliation (ORS 659A.199, 659A.885)

74.     Estes realleges paragraphs 1 through 68.

75.     In perpetrating the actions described in the above paragraphs, Metrc subjected Estes to retaliation for opposing and reporting in good faith information Estes believed to be evidence of violations of federal and/or state laws, rules, or regulations, including but not limited

to, Estes refusing Johnson's suggestion that Estes lie about the Chroma acquisition, Estes' report to Daley, and Estes' meeting with Kiehl.

76.    Specifically, and without limitation, Metrc materially decreased Estes' job responsibilities, failed to allow Estes to participate in the incentive bonus plan in his employment contract, and ultimately terminated Estes in retaliation for Estes' acts of opposing and reporting information related to Metrc's failure to provide a cannabis tracking system which effectively prevents diversion of marijuana products to the illicit market, Metrc's false claim to the State of California, and other states, that its CTS system does in fact prevent diversion, flag irregularities, and otherwise operating in accordance with law and the contractual expectations of state regulatory agencies, and Metrc's knowing collaboration with the DCC in a conspiracy to enable the State of California to reap substantial tax revenue in connection with the illegal interstate sale of marijuana

77.    Estes requests an award of damages, equitable relief, costs, and attorney fees as alleged in Paragraphs 69 through 73.

## SECOND CLAIM FOR RELIEF

### Unlawful Discharge

78.    Estes realleges paragraphs 1 through 68.

79.    At all material times, the public policy of the State of Oregon was to prohibit an employer from interfering with, discriminating and retaliating against employees for opposing and/or making good faith complaints about workplace health and safety violations and what she reasonably believed was unlawful conduct. This public policy is embodied in the common law, statutes, and regulations of the State of Oregon and the United States protecting the public and

employees including, but not limited to: ORS 659A.150 *et seq.*; OAR 839-009-0200 *et seq.*; 29 U.S.C. 2601, *et seq.; and Yeager v. Providence Health System Oregon,* 195 Or App 134 (2004).

80.     Estes had a public duty to ensure legal compliance by Metrc. His job duties required him to monitor and report legal compliance issues, and he has a general public duty to refrain from illegal acts. Therefore, he had a general duty to report illegal or fraudulent acts he was personally directed to complete or aware of, and he had a duty that arose from his employment to report legal non-compliance even when he wasn't personally implicated in the wrongful act.

81.     Metrc's decreasing Estes' job responsibilities and ultimately terminating Estes was in retaliation for Estes' pursuit and exercise of Estes's rights related to Estes' role as an employee, which rights are of important public interest.

82.     Estes requests an award of damages, equitable relief, costs, and attorney fees as alleged in Paragraphs 69 through 73.

[END OF PUTATIVE CLAIMS]

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2025, I served the foregoing DECLARATION OF

ANDREW C. DEWEESE IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S

MOTION TO DISMISS on the parties below:

[ x ]  by emailing a true and correct copy to the last known email address of each person
       listed below;
[ x ] by electronic means through the Court's Case Management/Electronic Case File
       system, which will send automatic notification of filing to each person listed below.


OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Dougals Paul
503-552-2140
douglas.paul@ogletree.com


DATED: May 23, 2025           **ANDREW DEWEESE, PC**


By: */s/ Andrew C. DeWeese*
Andrew DeWeese, OSB 136332
3055 SW Yeon Avenue, #527
Portland, Oregon 97210
andrew@andrewdeweese.com
Telephone: (971) 303-0351
*Attorney for Plaintiff*